THOMAS, Judge.
This is the second time that these parties have appeared before this court. See D.T. v. W.G, 255 So.3d 755 (Ala. Civ. App. 2016). As we explained in D.T.:
"In November 2013, the Tuscaloosa Probate Court ('the probate court') entered a judgment approving the adoption of A.S. ('the child') by the child's maternal grandmother, D.T. ('the adoptive parent'). In July 2015, W.G. ('the paternal grandmother') filed a petition seeking an award of grandparent visitation with the child pursuant to Ala. Code 1975, § 26-10A-30. The paternal grandmother did not request that a summons be issued or serve the adoptive parent with the petition by certified mail as required by Rule 4(a)(1), Ala. R. Civ. P. Instead, the paternal grandmother served the petition on the adoptive parent as one would serve a motion under Rule 5, Ala. R. Civ. P., by mailing a copy of the petition to the attorney who had served as the adoptive parent's counsel in the adoption proceeding. After a hearing, which the adoptive parent did not attend, the probate court entered a judgment on November 2, 2015, awarding visitation to the paternal grandmother."[1]
(Footnotes omitted.) We dismissed the adoptive parent's appeal in D.T. based on our conclusion that the November 2, 2015, judgment was void because the paternal grandmother had not properly instituted her action and had not properly served the adoptive parent. D.T., 255 So. 3d at ----.
*766 After the issuance of our opinion in D.T., the paternal grandmother instituted a new action seeking grandparent visitation under Ala. Code 1975, § 26-10A-30, and properly served the adoptive parent. The adoptive parent answered the complaint; in her answer, she included a constitutional challenge to § 26-10A-30. The probate court held a trial on the paternal grandmother's complaint on August 9, 2016, after which it entered a judgment on September 29, 2016, awarding the paternal grandmother visitation with the child. On October 6, 2016, the adoptive parent filed a postjudgment motion, which the probate court denied. The adoptive parent timely appealed the September 29, 2016, judgment to this court.
The trial testimony was either not recorded or not transcribed. Pursuant to Rule 10(e), Ala. R. App. P.,[2] the parties have submitted, and the probate court has approved, an agreed statement of the case. The facts contained in the statement of the case are as follows.
The paternal grandmother testified that she was present at the birth of the child in September 2008 and that she visited with the child every other weekend during the first six months of the child's life. According to the paternal grandmother, she had offered financial assistance to the child's parents by supplying them with diapers, wipes, food, and clothing for the child. The paternal grandmother also said that she babysat the child at her home during the day and, on occasion, overnight during the early months of the child's life. After the child's parents, who had lived together but were not married, separated, the paternal grandmother said, the mother and the child had lived in the home of the mother's great-grandmother. The paternal grandmother testified that she had continued to assist the mother with the needs of the child.
In March 2010, when the child was approximately 18 months old, the adoptive parent sought and was granted custody of the child through the Tuscaloosa Juvenile Court. Since that time, the adoptive parent said, the child has resided with her. The adoptive parent formally adopted the child in 2013. At the time of the child's adoption, the child's father was incarcerated.
The paternal grandmother testified that she had hosted birthday parties for the child each year until 2013. She also testified that she had been allowed overnight visits in her own home with the child until January 2012. After the adoption was finalized, the paternal grandmother testified, the adoptive parent began to severely limit her access to the child. During 2013 and 2014, the paternal grandmother said, the adoptive parent allowed only six visits with the child; two of those visits were two-hour supervised visits in the adoptive parent's home. According to the paternal grandmother, after September 2014, the adoptive parent refused to allow the paternal grandmother to visit with the child.
*767 The paternal grandmother testified that her last unsupervised visit with the child was on the child's fifth birthday in 2012. According to the paternal grandmother, when she was returning the child to the adoptive parent's home, she told the child that she might not be able to visit with her for a long time. The paternal grandmother said that the child responded by stating that she "could pack a bag, climb out her window and the [paternal] grandmother could come pick her up." The paternal grandmother said that she had discouraged the child's idea.
The paternal grandmother moved from Demopolis to Louisiana in 2013 for employment-related reasons and to care for her ailing father. The paternal grandmother does not own a home in Louisiana and lives with her fiancé. She testified that the child's father is no longer incarcerated and that he is in a rehabilitation program. She stated that "she would 'absolutely not' restrict access to the child by her biological father during her visits." She also said that she intended to reunite the child with her father at some point in the future. The paternal grandmother stated that she would be present when the child visited with the father.
The adoptive parent explained that she had discontinued overnight visits with the paternal grandmother after the child had told her that, when she had become scared one night, she had gone into the paternal grandmother's bedroom, where the paternal grandmother was in bed with a man to whom the paternal grandmother was not married. The adoptive parent said that the paternal grandmother had admitted that the man had been in her bed and that he had been in her home during other overnight visits.
The adoptive parent said that she had several concerns about allowing the paternal grandmother unsupervised or overnight visitation with the child. She expressed discomfort with the fact that the paternal grandmother lives in another state and about the paternal grandmother's cohabitation with a man to whom she is not married. The adoptive parent also testified that she did not want the child to have contact with her father. The adoptive parent admitted that she had "blocked" the paternal grandmother's telephone number because the adoptive parent had become frustrated over the paternal grandmother's continual text messages requesting telephone visitation with the child and the paternal grandmother's refusal to "take 'no' for an answer."
The probate court made the following factual findings in its judgment:
"[The child] was born on September 18, 2008, to [the biological mother] and [the father] [ (referred to collectively as 'the natural parents') ]. The adoptive parent is the maternal grandmother of the ... child and [the paternal grandmother] is the natural paternal grandmother of the ... child. Both [the adoptive parent and the paternal grandmother] were present at the ... child's birth, and provided substantial support to her natural parents during the ... child's infancy. [The paternal grandmother] had a visible and active presence in the ... child's life since her birth. While the ... child was under the care and custody of her [biological] mother, [the paternal grandmother] visited [the child] every other weekend, assisted the ... child's natural parents financially, provided babysitting services during the day and overnight, gifts, and paid for necessities, such as food, diapers, wipes, and clothes.
"In or about 2010, it became evident that the ... child's natural parents could not provide the necessary care to the ... child. [The adoptive parent], without objection from the [the paternal grandmother], *768 obtained custody of the ... child through the Tuscaloosa County Juvenile Court. After [the adoptive parent] was awarded custody, [the paternal grandmother] continued to see the ... child on a regular basis and continued to provide emotional and financial support to the ... child. [The paternal grandmother] hosted the ... child's birthday parties at [her] home every year until 2013. The testimony of the [adoptive parent] and [the paternal grandmother] clearly established that [the paternal grandmother] had a close and loving relationship with the ... child that benefited the ... child.
"In 2013, unbeknownst to the [paternal grandmother], [the adoptive parent] filed a petition in this Court to adopt the ... child. This Court granted the adoption in Case No. PC-2013-700 on November 12, 2013. After [the adoptive parent] became the ... child's adoptive parent, [she] refused to allow [the paternal grandmother] to maintain her relationship with the ... child. [The adoptive parent] refused to respond to text messages from [the paternal grandmother] seeking to talk to and visit with the ... child for weeks. [The adoptive parent] also blocked [the paternal grandmother's] [tele]phone number because [the adoptive parent] believed that the text messages from [the paternal grandmother] were 'annoying' and because [the paternal grandmother] 'refused to take "no" for an answer,' when it came to [her] requests to see her granddaughter.
"[The adoptive parent] offered no evidence to support her decision to cut-off [the paternal grandmother's] long-standing relationship with the ... child. Nor did [the adoptive parent] offer any evidence that having a relationship with [the] paternal grandmother ... would not be in the ... child's best interest. Furthermore, [the paternal grandmother] is the only connection the ... child has to the paternal side of her family and familial relationships are beneficial to the ... child."
On appeal, the adoptive parent asserts four arguments. She first contends that the probate court erred by not appointing a guardian ad litem for the child. She next argues that § 26-10A-30 is unconstitutional, both facially and as applied to her. Finally, the adoptive parent complains that the probate court's decision to award visitation to the paternal grandmother is not supported by clear and convincing evidence that such visitation would be in the child's best interest.
We will first consider the adoptive parent's arguments regarding the constitutionality of § 26-10A-30. Although she argues that the statute is both facially unconstitutional and unconstitutional as applied to her in this particular instance, the adoptive parent's arguments regarding constitutionality are premised almost entirely on the principle that she, as the child's parent, has the fundamental right to the child's care, custody, and control, which right the United States Supreme Court, in Troxel v. Granville, 530 U.S. 57, 73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), concluded had been violated by a Washington statute allowing third parties to seek visitation with a child over the objection of the child's parent.[3] The Troxel Court concluded *769 that the judgment awarding visitation under the Washington statute amounted to an "unconstitutional infringement on [the parent's] fundamental right to make decisions concerning the care, custody, and control of her [children]." Troxel, 530 U.S. at 72, 120 S.Ct. 2054. However, as admitted by the adoptive parent, our supreme court has already rejected the argument that § 26-10A-30 is unconstitutional based on the holding in Troxel. See Ex parte D.W., 835 So.2d 186 (Ala. 2002). Our supreme court explained in Ex parte D.W. that § 26-10A-30 did not violate the principles articulated in Troxel because the adoptive relationship is a status created by statute and, thus, that the legislature is free to define the rights of adoptive parents as it sees fit, even to the extent of limiting those rights to allow for the possibility of court-ordered visitation with grandparents in certain instances. Ex parte D.W., 835 So.2d at 190-91 ; see also Weathers v. Compton, 723 So.2d 1284, 1286 (Ala. Civ. App. 1998) (stating that, in enacting former Ala. Code 1975, § 26-10-5, the predecessor statute to § 26-10A-30, the legislature "acknowledge[d] an exception to the general rule that an adoption order that terminates the rights of the natural parents also terminates the rights of the natural grandparents"). Although the adoptive parent argues that "a large body of law has evolved that makes clear that Ex parte D.W. was wrongly decided," this court is bound by the holding of Ex parte D.W., and we are therefore not at liberty to reach the conclusion that the adoptive parent urges. See Ala. Code 1975, § 12-3-16 ("The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals ....").
The adoptive parent also contends that the fact that the statute places jurisdiction over such visitation issues in the probate court, which, she says, is not a court of record[4] "in Tuscaloosa County," fails to protect her due-process right to meaningful review of the evidence. She rests her argument on one citation to authority: M.L.B. v. S.L.J., 519 U.S. 102, 107, 117 S.Ct. 555, 136 L.Ed.2d 473 (1999), in which the United States Supreme Court determined that a parent appealing the termination of his or her parental rights cannot be denied meaningful review of that judgment by a requirement that he or she prepay the costs of compiling the record on appeal. M.L.B. is inapposite. The adoptive parent has appealed and, as provided for in Rule 10(e), has presented an agreed statement of the case in lieu of a transcript of the proceedings. The adoptive parent has provided no authority demonstrating how the probate court's jurisdiction over adoption matters has deprived the adoptive parent of any of her rights to due process. We are not required to perform that research for her. See Brooks v. Brooks, 991 So.2d 293, 303 (Ala. Civ. App. 2008) ("[I]t is neither our duty nor our function to perform legal research for an appellant."). We conclude, therefore, that she has not convincingly demonstrated *770 that the legislature's choice to place adoptions and ancillary matters under the jurisdiction of the probate court renders § 26-10A-30 unconstitutional as applied to her.
The adoptive parent next argues that § 26-10A-30 is unconstitutional as applied to her in the present case because, she says, the probate court violated her right to due process by considering ex parte communications with the paternal grandmother during the proceedings leading up to the entry of the November 2015 judgment that we reversed in D.T. Although a court's consideration of ex parte communications might violate a party's due-process rights, see Ex parte R.D.N., 918 So.2d 100, 105 (Ala. 2005), we cannot see how a court's inappropriate consideration of ex parte communications would compel the conclusion that a statute was unconstitutional as applied. In any event, the adoptive parent did not make any argument to the probate court that its judgment was based on improper ex parte communications. Thus, we cannot further consider the adoptive parent's argument that the probate court violated her due-process rights by engaging in what the adoptive parent characterizes as "ex parte communications" when the paternal grandmother gave testimony at the earlier trial in this matter or otherwise communicated with the probate court. See M.G. v. J.T., 90 So.3d 762, 764 (Ala. Civ. App. 2012) (declining to consider a mother's argument that a juvenile court's judgment was void because the juvenile court had allegedly engaged in ex parte communications with a guardian ad litem because the mother had failed to raise the argument in the juvenile court).
We turn now to the adoptive parent's argument that the probate court's judgment should be reversed because the probate court failed to appoint a guardian ad litem for the child, which she contends was required by Rule 17(c), Ala. R. Civ. P.[5] The adoptive parent filed a motion seeking the appointment of a guardian ad litem for the child on August 5, 2016, four days before the date set for trial. The probate court declined to appoint a guardian ad litem for the child.[6]
Rule 17(c) reads, in pertinent part, as follows: "The court shall appoint a guardian ad litem (1) for a minor defendant, or (2) for an incompetent person not otherwise represented in an action and may make any other orders it deems proper for the protection of the minor or incompetent person." Thus, the rule requires the appointment of a guardian ad litem for a minor defendant.[7] However, the record does not indicate that the child in the present case was a defendant in the action.
*771 We therefore cannot agree with the adoptive parent that the probate court violated Rule 17(c) by declining to appoint a guardian ad litem for the child.
The adoptive parent also relies on English v. Miller, 370 So.2d 968 (Ala. 1979), to support her argument that appointment of a guardian ad litem was required in the present case. At issue in English was the ownership of the funds in two savings accounts. English, 370 So.2d at 969. Ora Mae English contended that her deceased brother, Leroy English, had given the funds in the accounts to her. Id. Leroy's former wife, Edna Faye English, claimed that the funds had been awarded to her and their two children in a divorce action. Id. Each account indicated that the account holders were Leroy or Ora Mae as trustee for one of the two children. Id. Our supreme court reversed the trial court's judgment awarding the funds to Ora Mae because the trial court had failed to make the children, who had a potential interest in the funds and were therefore indispensable parties under Rule 19(a), Ala. R. Civ. P., parties to the action or to appoint a guardian ad litem for them. Id. The supreme court noted that a guardian ad litem should be appointed on remand because of "[t]he possibility that the children's interest, if any, is adverse to the interest of those made parties, including their mother, Edna Faye English." Id.
English is inapposite here, however, because the basis for the supreme court's reversal of the trial court's judgment was its conclusion that the children in English were indispensable parties to the action. Because the supreme court ordered that the children be made parties to the action, Rule 19(a) would require appointment of a guardian ad litem for them. The child in the present case is not a party to the action; nor does the adoptive parent argue that the child is a necessary or indispensable party to the action. We conclude, therefore, that English does not require the probate court to appoint a guardian ad litem for the child.
Finally, we turn to the adoptive parent's argument that the probate court's decision to award the paternal grandmother visitation was not supported by the evidence. The adoptive parent admits that § 26-10A-30 does not indicate the burden of proof imposed upon the party seeking visitation under that statute. She then asserts that "that standard would have to be at least 'clear and convincing evidence.'" To support her assertion, she relies on cases interpreting former Ala. Code 1975, § 30-3-4.1, to require a clear-and-convincing-evidence burden of proof.[8] See L.B.S. v. L.M.S., 826 So.2d 178 (Ala. Civ. App. 2002) ; and J.W.J., Jr. v. P.K.R., 976 So.2d 1035, 1042 n.4 (Ala. Civ. App. 2007).
However, in light of our supreme court's holding in Ex parte D.W., we cannot agree that the burden of proof required under former § 30-3-4.1 is also required to support the award of visitation to a grandparent under § 26-10A-30. Our supreme court explained in Ex parte D.W. that the adoptive-parent status created by the adoption code specifically limited the rights of adoptive parents "by allowing the possibility of court-ordered grandparent visitation over the objections of the adopti[ve] parents," and it concluded that adoptive *772 parents and natural parents "must be treated differently" as a result of the purely statutory nature of the adoption relationship. Ex parte D.W., 835 So.2d at 191. Because the rights of adoptive parents are not equivalent to those of natural parents, the need for the clear-and-convincing-evidence burden of proof-to overcome the fundamental right of a parent to the care, custody, and control of his or her child-is not present in a grandparent-visitation case arising under § 26-10A-30. Thus, we reject the adoptive parent's argument that the probate court's judgment determining that visitation with the paternal grandmother was in the best interest of the child was required to be supported by clear and convincing evidence.
The adoptive parent further argues that the paternal grandmother failed to establish that visitation with the child would be in the child's best interest. Relying on In re Grandparent Visitation of Cathy L.(R.)M. v. Mark Brent R., 217 W.Va. 319, 617 S.E.2d 866 (2005) (" Cathy"), and Mizrahi v. Cannon, 375 N.J.Super. 221, 867 A.2d 490 (App. Div. 2005), the adoptive parent contends that the paternal grandmother failed to demonstrate that she and the child had a recent, close relationship worth preserving or that a connection with the child's biological paternal relatives was worth maintaining. We will examine both Cathy and Mizrahi.
In Cathy, the West Virginia Supreme Court of Appeals considered whether an award of grandparent visitation after an adoption of the child was proper under W. Va. Code § 48-10-502, the West Virginia statute governing grandparent visitation. The child in Cathy had been adopted by her paternal great-uncle and his wife. Cathy, 217 W.Va. at 321, 617 S.E.2d at 868. The child's paternal grandmother and her husband sought visitation with the child after the adoptive parents terminated their contact with the child. Id. The trial court awarded visitation to the paternal grandmother and her husband, and the adoptive parents appealed. Id.
The Cathy court reversed the award of grandparent visitation based on its conclusion that the trial court had not given proper weight to the adoptive parents' preference that the child not visit with the child's biological paternal grandparents. 217 W.Va. at 328, 617 S.E.2d at 875. Like the adoptive parent in the present case, the adoptive parents in Cathy objected to visitation, in part, because of the risk of involvement with the child's biological father. 217 W.Va. at 327, 617 S.E.2d at 874. The Cathy court indicated that the trial court had "dismissed" the concerns of the adoptive parents, "primarily upon the basis of the court's disagreement with the [adoptive] parents regarding the degree of family strain to be occasioned by visitation and the court's perception that visitation would not seriously undermine any plans the [adoptive] parents envisioned for [the child] or her familial associations." 217 W.Va. at 328, 617 S.E.2d at 875. Such dismissal of the adoptive parent's concerns based on the judge's perceptions of the best interest of the child, the Cathy court explained, was the basis for the decision to invalidate the Washington grandparent-visitation statute at issue in Troxel. Id. Because the trial court did not give proper consideration to the adoptive parents' wishes and concerns, the Cathy court concluded, the evidence at trial did not demonstrate that visitation was in the best interest of the child. Id.
The adoptive parent in the present case argues that we should look to the decision in Cathy and determine, as that court did, that the evidence before the probate court does not support a conclusion that the child's best interest will be served by visitation with the paternal grandmother. Her *773 concerns about the child's exposure to the paternal grandmother's fiancé and potential contact with the biological father, she says, were not given the appropriate weight or proper consideration by the probate court. Therefore, she concludes, a reversal of the award of visitation to the paternal grandmother is warranted.
We must disagree. The decision in Cathy is rooted in the holding of Troxel. As we have already explained, our supreme court has clearly differentiated the rights of a natural parent from the rights of an adoptive parent, which flow from the adoption code. Ex parte D.W., 835 So.2d at 191. A probate court considering grandparent visitation under § 26-10A-30 is not required to give any special weight to the wishes of the adoptive parent. Instead, its only concern is whether the requested visitation will serve the best interest of the child.
The adoptive parent's reliance on Mizrahi is not as easily dismissed. In Mizrahi, the Appellate Division of the New Jersey Superior Court examined the propriety of a grandparent-visitation order awarding visitation to the paternal grandparents of a child who, after the death of her mother, was being adopted by the child's great-aunt and her husband. Mizrahi, 375 N.J.Super. at 227, 867 A.2d at 493. The New Jersey court determined that, under the applicable statute, N.J. Stat. Ann. § 9:2-7.1, and the caselaw interpreting it, grandparents seeking an award of visitation "must establish that denying visitation would wreak a particular identifiable harm, specific to the child, to justify interference with a parent's fundamental due process right to raise a child free from judicial interference and supervision." 375 N.J.Super. at 234, 867 A.2d at 498. Based on its review of the record, the New Jersey court concluded that the trial court had considered the child's best interest as opposed to whether she would suffer harm if she were not allowed to visit with her paternal grandparents. 375 N.J.Super. at 232, 867 A.2d at 497. Near the conclusion of the opinion reversing the award of grandparent visitation, the New Jersey court stated: "That the [paternal grandparents] may have had a warm relationship with [the child] until January 2001, when [the child] was three years old, does not mean that [the child] will experience harm now if visitation is not ordered." 375 N.J.Super. at 234, 867 A.2d at 498.
The adoptive parent admits that the harm standard discussed in Mizrahi is inapplicable here. However, she contends that we should consider, as the New Jersey court did, that the fact that a warm and loving relationship existed between the paternal grandmother and the child in the present case during the first 18 months of the child's life does not compel the conclusion that it is in the best interest of the child to reestablish that relationship through court-ordered visitation. The adoptive parent further contends that the probate court did not have before it evidence relating to the specific best interest of the child at issue; that is, she contends that the paternal grandmother failed to present evidence[9] indicating that "it was in the best interest of this particular child to have visitation with this particular grandparent." Instead, she says, the paternal grandmother "asserted only vague generalities about the benefit of adopted *774 children having relationships with their biological relatives."
This court has set out guidelines to assist courts applying § 26-10A-30. See Weathers, 723 So.2d at 1287. In Weathers, this court explained that a trial court considering whether to grant visitation rights to a grandparent pursuant to § 26-10A-30"must determine, after a careful consideration of all the evidence, whether [the grandparent's] continued participation in [his or her] grandchild's life after that child has been adopted by [a relative listed in § 26-10A-30 ] is a benefit to the child that outweighs any potential detriment." Weathers, 723 So.2d at 1287. In addition, the Weathers court noted that "[s]upportive family relationships are vital to the growth and development of a child." Weathers, 723 So.2d at 1287.
We must begin our review of the probate court's determination that visitation with the paternal grandmother would be in the child's best interest by noting that our review is limited to considering whether the probate court abused its discretion. Loftin v. Smith, 590 So.2d 323, 326 (Ala. Civ. App. 1991). Because the probate court took oral testimony, we are constrained by the ore tenus rule to presume that the factual findings of the probate court are correct unless they are "so unsupported by the evidence as to be plainly and palpably wrong." Snipes v. Carr, 526 So.2d 591, 592 (Ala. Civ. App. 1988). According to its judgment, the probate court found that, based on the evidence presented, the paternal grandmother and the child had "a close and loving relationship ... that benefited the ... child" until late 2013. The probate court also noted that the paternal grandmother was the only connection the child had to her paternal relatives and found, consistent with Weathers, that "familial relationships are beneficial to the ... child."
The adoptive parent contends that the probate court improperly placed on her the burden of proving that visitation with the paternal grandmother would not be in the best interest of the child. Indeed, the probate court's judgment states that the adoptive parent had not "offer[ed] any evidence that having a relationship with [the] paternal grandmother ... would not be in the ... child's best interest" and had "offered no evidence to support her decision to cut off [the paternal grandmother's] long-standing relationship with the ... child." Although we understand why the adoptive parent might believe that these statements indicate that the probate court was, in fact, requiring her to establish a basis to deny the requested visitation, we cannot agree that the probate court placed the burden of proof on the adoptive parent. Instead, it appears that the probate court concluded that the paternal grandmother and the child had enjoyed a close, loving relationship, that that relationship was a benefit to the child, and that the adoptive parent had not presented evidence satisfying the probate court that her decision to terminate that relationship was warranted or necessary. Thus, we read the judgment as concluding that an award of visitation to the paternal grandmother was warranted because of the close, loving, and beneficial relationship that the child had enjoyed with her, that the relationship should be allowed to continue so that the child could maintain a connection with her paternal relatives, and that no evidence indicated that the child's best interest would be better served by denying the requested visitation. Based on our limited record and our deferential standard of review, we cannot conclude that the probate court abused its discretion in awarding the paternal grandmother vitiation with the child under § 26-10A-30.
*775 Based on our supreme court's holding in Ex parte D.W., we have rejected the adoptive parent's constitutional challenges to § 26-10A-30. We have also rejected her argument that the judgment should be reversed because of the probate court's failure to appoint a guardian ad litem for the child. We have further rejected the adoptive parent's contention that the appropriate burden of proof under § 26-10A-30 is the clear- and-convincing-evidence standard. Under our limited standard of review, we have determined that the evidence before the probate court supports the probate court's conclusion that the child's best interest would be served by allowing visitation with the paternal grandmother. Accordingly, the judgment of the probate court is affirmed.
AFFIRMED.
Pittman, Moore, and Donaldson, JJ., concur.
Thompson, P.J., concurs in the result, without writing.

In this opinion, we use the same defined terms we used in D.T.

Rule 10(e) provides:
"In lieu of the record on appeal as defined in subdivision (a) of this rule, the parties may prepare and sign a statement of the case showing how the issues presented by the appeal arose and how they were decided in the trial court and setting forth only so many of the facts averred and proved or sought to be proved as are essential to a decision of the issues presented. If the statement conforms to the truth, it, together with such additions as the court may consider necessary to present fully the issues raised by the appeal, shall be approved by the trial court and shall then be certified to the appellate court to which the appeal is taken as the record on appeal, and it shall be transmitted thereto by the clerk of the trial court within the time provided by Rule 11."
(Emphasis added.)

In her argument that § 26-10A-30 is unconstitutional as applied to her, the adoptive parent specifically contends that the fact that § 26-10A-30 allows a request for visitation to be brought "at any time" "poses the same problem ... as it did in Troxel," namely that the State has no compelling interest in promoting visitation well after a child has adjusted to her adoptive family, and that the probate court's statement in its judgment that the adoptive parent had not presented evidence indicating that visitation would not be in the child's best interest suffers from the same problem as did the judgment at issue in Troxel, namely that the probate court failed to give sufficient weight to the adoptive parent's decision to deny visitation or to her concerns about allowing visitation. As explained in the text, infra, because these arguments are premised on the application of the principles announced in Troxel, they are inapplicable to § 26-10A-30.

We note that a probate court is a court of record. See Terry v. Gresham, 254 Ala. 349, 351, 48 So.2d 437, 438 (1950) ; and Whitaker v. Kennamer, 229 Ala. 80, 155 So. 855 (1934). The fact that a probate court lacks a full-time or official court reporter does not change that fact. Terry, 254 Ala. at 351, 48 So.2d at 438.

The adoptive parent cites other statutes that require the appointment of a guardian ad litem in other types of actions: Ala. Code 1975, § 12-15-304 (requiring appointment of a guardian ad litem for a child in dependency and termination-of-parental-rights cases when the child is a party); 26-10A-22(b) (requiring appointment of a guardian ad litem for the child in a contested adoption proceeding); and § 26-17-612(b) (requiring appointment of a guardian ad litem for a child who is a party to a paternity proceeding). However, none of those statutes are applicable to visitation proceedings in the probate court under § 26-10A-30.

The adoptive parent indicates that the probate court denied her motion; however, no ruling on the motion appears in the record. The paternal grandmother appears to admit that the motion was, in fact, denied, and no order appointing a guardian ad litem is contained in the record. Thus, for purposes of this opinion, we will consider the motion seeking appointment of a guardian ad litem for the child as having been denied.

Rule 17(c) permits a court to "make any other orders it deems proper for the protection of the minor"; however, the rule does not require that such an order be entered.

Former § 30-3-4.1, a general grandparent-visitation statute, was declared unconstitutional in Weldon v. Ballow, 200 So.3d 654 (Ala. Civ. App. 2015). The legislature has enacted another grandparent-visitation statute, see Ala. Code 1975, § 30-3-4.2, which became effective August 1, 2016. The paternal grandmother did not seek visitation under the newly enacted statute, which had not become effective at the time she instituted the underlying action in the probate court.

The adoptive parent contends that the paternal grandmother failed to present clear and convincing evidence relating to the best interest of the child. In light of our determination that the clear-and-convincing-evidence burden of proof is not applicable, we have recast the mother's argument as one contending that the burden of proof was not met because of the lack of sufficient evidence relating to the specific best interest of the child at issue.